SCOTT J. SAGARIA (BAR # 217981)
sjsagaria@sagarialaw.com
ELLIOT W. GALE (BAR #263326)
egale@sagarialaw.com
JOE B. ANGELO (BAR #268542)
jangelo@sagarialaw.com
SCOTT M. JOHNSON (BAR #287182)
sjohnson@sagarialaw.com
**SAGARIA LAW, P.C.**
3017 Douglas Blvd., Ste. 100
Roseville, CA 95661
408-279-2288 ph
408-279-2299 fax

Attorneys for Plaintiff
John Brown

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| JOHN BROWN**,**<br><br>                    Plaintiff,<br><br>        v.<br><br>Equifax, Inc.; Navy Federal Credit Union and DOES 1 through 100 inclusive**,**<br><br>                    Defendants. | CASE NO.<br><br>COMPLAINT FOR DAMAGES:<br><br>  1.  Violation of Fair Credit Reporting Act;<br>  2.  Violation of California Consumer Credit Reporting Agencies Act; |

COMES NOW Plaintiff JOHN BROWN, an individual, based on information and belief, to allege as follows:

### **INTRODUCTION**

1.  This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt included in Plaintiff's Chapter 13 bankruptcy.

2. Here the reporting involves that Plaintiff's account is charged off, in collections, and is not reporting that Plaintiff filed for chapter 13 bankruptcy.

3. There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

4. The *majority* of consumer Debtors who file consumer bankruptcy do so to *raise* their FICO Score and remedy their poor credit worthiness.

5. It is entirely possible for consumer Debtors to have over a 700 FICO Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

6. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

7. In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting bankruptcies and debts included in those bankruptcies in an effort to keep consumers' credit scores low and their interest rates high.

8. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

9. These credit reporting issues are most prevalent in Chapter 13 bankruptcy filings.

10. Consequently, in the United States today it is objectively worse for consumers' credit worthiness to file Chapter 13 and pay back some or all of their debt, as opposed to filing Chapter 7 liquidation where Creditors generally receive nothing.

11. This was not the intent of Congress when enacting the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

12. Plaintiff re-alleges and incorporates herein by this reference the allegations in each and every paragraph above, fully set forth herein.

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

14. This venue is proper pursuant to 28 U.S.C. §1391(b).

## GENERAL ALLEGATIONS

15. Plaintiff alleges that each and every defendant data furnisher was included in Plaintiff's Chapter 13 bankruptcy filing.

16. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

17. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

18. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's ability to reorganize and repair Plaintiff's FICO Score.

19. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

20. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

3

23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

27. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

30. Each of the five factors is weighted differently by FICO.

31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

36. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

**Metro 2**

37. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

38. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

39. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

40. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

41. The CDIA is *The* expert on accurate credit reporting. In support of this allegation Plaintiff avers the following:

    a. The CDIA offers a FCRA certificate program for all CRAs.

    b. The CDIA offers a FCRA awareness program for all CRAs.

    c. The CDIA offers a FCRA Certificate program for DFs.

    d. The CDIA offers a FCRA awareness program for DFs.

    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

   f.   The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

   g.   The CDIA developed a credit reporting resource guide for accurately reporting credit.

42. The CDIA's Metro 2 is accepted by all CRAs.

43. The credit reporting accepted industry standards for reporting metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

44. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

45. The CRRG is not readily available to the public. It can be purchased online for $229.45.

46. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**e-OSCAR**

50. E-OSCAR is the web based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

51. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

52. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53. When a consumer files bankruptcy certain credit reporting industry standards exist.

54. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

55. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

56. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

57. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

59. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

60. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

61. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

62. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

63. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

64. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

65. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.

66. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

7

67. Under the Fair Credit Reporting Act a bankruptcy can be reported for ten years.

68. The ten-year rule for reporting runs from the date the bankruptcy was *filed.*

69. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

70. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

71. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Plaintiffs Bankruptcy Filing**

72. Plaintiff filed for Chapter 13 bankruptcy protection on August 23, 2013 in order to reorganize and repair Plaintiff's credit worthiness and FICO Score.

73. Chapter 13 of the Bankruptcy Code is titled "Adjustment of Debts of an Individual with Regular Income."

74. Plaintiff's plan was confirmed on February 4, 2014.

75. On November 28, 2016 Plaintiff ordered a three bureau report from Equifax, Inc. to ensure proper reporting by Plaintiff's Creditors.

76. Plaintiff noticed several different trade lines on the November 28, 2016 credit report all reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

77. Multiple trade lines continued to report Plaintiff's accounts with past due balances, inaccurate balances, and/or inaccurate monthly payments owed.

78. Some accounts even failed to register that Plaintiff was making payments on the account through Plaintiff's Chapter 13 plan.

79. Defendant Navy Federal Credit Union was included in those disputed trade lines.

80. In response, Plaintiff disputed the inaccurate tradelines via certified mail with Experian Information Solutions, Inc.; Equifax, Inc.; and TransUnion, LLC on February 21, 2017.

81. Plaintiff's dispute letter specifically put each Creditor on notice that Plaintiff had filed for bankruptcy and specifically requested each Creditor investigate the proper way to report Plaintiff's accounts once a bankruptcy was filed.

8

82. Plaintiff noted that the accounts should be reported disputed if the Creditor disagreed with Plaintiff's dispute.

83. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.

84. On May 11, 2017 Plaintiff ordered a second credit report from Equifax, Inc. to ensure Plaintiff's accounts had been updated.

85. Defendant Navy Federal Credit Union was reporting Plaintiff's account, beginning in 40609xxxx as being in collections and charged off.

86. Navy Federal is also not reporting that the account is subject to Plaintiff's chapter 13 bankruptcy as it is not reporting the CII D, which indicates that the account was included in a chapter 13 bankruptcy.

87. By failing to report the correct CII it appears that the account is subject to active collections and that Plaintiff can be garnished or levied, despite including the account in the bankruptcy filing.

88. The failure to update the CII to D also is misleading as potential lenders reviewing the credit report may not be aware the account is subject to Plaintiff's chapter 13 bankruptcy.

89. The actions of Defendants Equifax and Navy Federal  as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

90. The actions of Navy Federal  as alleged herein are acts in violation of the Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants and Does 1-100)

**Navy Federal  –Failure to Reinvestigate.**

91. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

92. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and

requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

93. Defendants Navy Federal violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

94. The CRAs provided notice to the Defendants that Plaintiff was disputing the inaccurate and misleading information but Navy Federal failed to conduct a reasonable investigation of the information as required by the FCRA.

95. Based on Plaintiff's dispute, Defendant Navy Federal should have known its account was included in Plaintiff's Chapter 13 plan of reorganization and reflect the payments it received.

96. The most basic investigation would include a simple review of well-established credit reporting industry standards.

97. Plaintiff alleges Defendant Navy Federal did not review well established industry standards for credit reporting.

98. If Defendant Navy Federal had reviewed such standards Defendant Navy Federal would have seen their reporting was not in compliance and consequently inaccurate and or incomplete.

99. Such an investigation would be reasonable.

100. Plaintiff also alleges that Defendant Navy Federal did not investigate whether Plaintiff filed for bankruptcy, whether their accounts were included, the terms of the plan, whether or not the terms had been approved, and what payments were received.

101. The lack of investigation is unreasonable.

**Willfulness**

102. Plaintiff further alleges that Defendant Navy Federal's actions were willful because each Defendant has instituted reckless policies and procedures that make inaccuracies inevitable.

103. Specifically, Navy Federal does not properly train its employees investigating disputes on credit reporting industry standards and instead employees are regularly expected to verify that whatever information is being reported currently is generally accurate.

104.  Plaintiff further alleges that to the extent any investigation takes place such investigation as a policy is cursory (taking less than five minutes) in nature rather than reasonable.

105.  Last Plaintiff alleges that Navy Federal intentionally hires employees outside of the United States to investigate disputes in an intentional effort to frustrate a consumer's ability to confront those individuals directly responsible for the accuracy of their report.

**Damages**

106.  Given that the actions of Navy Federal  were willful Plaintiff is entitled to statutory damages of not less than $100 and not more than $1,000 plus punitive damages under 15 U.S.C §1681n.

107.  Plaintiff also seeks actual damages related to Plaintiff's emotional distress and frustration over Defendant Navy Federal's refusal to update the accounts described herein and the cost of pulling the credit report at issue for the sole purpose of verifying accuracy AFTER the dispute process was complete.

**Equifax, Inc. – Failure to Reinvestigate Disputed Information.**

108.  Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

109.  After Plaintiff disputed the accounts mentioned above, Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

110.  Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

111.  Plaintiff alleges that Equifax has a duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

112.  Equifax is not a passive entity bound to report whatever information a DF provides.

113.  Plaintiff alleges that Equifax is readily familiar with Metro 2 guidelines and credit reporting industry standards.  .

114.  Plaintiff alleges that Equifax can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

115.  Equifax can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

116.  Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

117.  Equifax would have known that Plaintiff filed for Chapter 13 based on multiple other accounts reporting as much.

118.  Equifax would have known reporting a past due balance post confirmation does not comport with industry standards.

119.  Equifax  therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

**Willfulness**

120.  Plaintiff further alleges that Equifax's actions were willful because each Defendant has instituted reckless policies and procedures that make inaccuracies inevitable.

121.  Specifically, neither Defendant properly trains its employees investigating disputes on credit reporting industry standards. Instead employees are regularly expected to verify that whatever information is being reported currently is generally accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

122.  Plaintiff further alleges that to the extent any investigation takes place such investigation as a policy is cursory (taking less than five minutes) in nature rather than reasonable.

123.  Last Plaintiff alleges that Equifax intentionally hires employees outside of the United States to investigate disputed in an intentional effort to frustrate a consumer's ability to confront those individuals directly responsible for the accuracy of their report.

**Damages**

124.  Equifax disseminated the inaccurate information contained herein to JPMorgan Chase on January 17, 2015

12

125. Given that the actions of Equifax were willful Plaintiff is entitled to statutory damages of not less than $100 and not more than $1,000 plus punitive damages under 15 U.S.C §1681n.

126. Plaintiff also seeks actual damages related to Plaintiff's emotional distress and frustration over Equifax's refusal to update the accounts described herein and the cost of pulling the credit report at issue for the sole purpose of verifying accuracy AFTER the dispute process was complete.

## SECOND CAUSE OF ACTION
(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants and Does 1-100)

**Navy Federal – Reporting Inaccurate Information to CRAs.**

127. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

128. In the regular course of its business operations, Navy Federal routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

129. Navy Federal intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not comport with well-established industry standards.

130. Plaintiff alleges that Navy Federal re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

131. Plaintiff also alleges that Defendant Navy Federal had reason to know that the information reported on Plaintiff's accounts were misleading, inaccurate, incomplete, and did not comport with well-established credit reporting industry standards.

132. Plaintiff alleges that Defendant Navy Federal had reason to know that by not comporting with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

133. Plaintiff alleges that the bankruptcy notices, disputes letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to Defendants of its misleading and

inaccurate reporting as well as being noticed of the plan confirmation and proof of claim forms sent by the U.S. Bankruptcy Court.

134. Navy Federal failed to notify Experian Information Solutions, Inc. and Equifax, Inc. that the information Defendants re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

135. Defendant Navy Federal 's communication of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

136. As a direct and proximate result of Defendant Navy Federal 's willful and untrue communications, Plaintiff has suffered actual damages including but not limited to inability to properly reorganize under Chapter 13, reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, emotional distress and such further expenses in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Assure Credit Reporting Accuracy.**

137. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

138. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

139. Had Equifax maintained reasonable procedures to assure maximum accuracy Experian would never have allowed Defendant Navy Federal to report the account as described herein.

140. As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

14

141. The violations described herein by Equifax were willful, specifically the Credit Bureaus including defendant Equifax have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

142. Equifax intentionally sends consumer disputes to employees who do not live within the continental United States.

143. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

144. These employees for Defendant Equifax receive little to know training concerning how to accurately report consumer debt.

145. Instead these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate.

146. Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

147. Equifax has intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

148. Equifax also allowed both Data furnishers to report these accounts post chapter 13 confirmation with actual knowledge of the bankruptcy filing.

149. The same credit report that contain these inaccuracies also reflects in the public records section that Plaintiff has filed for chapter 13 bankruptcy.

150. Equifax knew plaintiff filed bankruptcy and yet somehow allowed these data furnishers to reports inaccurately and obviously outside of recognized industry standards.

151. Given that Equifax helped draft the CRRG,  and Plaintiff specifically referenced industry guidelines in the dispute letter Equifax knew that these accounts were not reporting in a manner consistent with industry standards i.e. accurate, but chose to do nothing.

152. Consequently, Defendant Equifax is liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Equifax was at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

153. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

15

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Review and Consider All Relevant Information.**

154. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

155. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

156. As a result of Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to , damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

157. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

158. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

159. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FIFTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants and Does 1-100)

**Equifax, Inc. – Failure to Delete Disputed and Inaccurate Information.**

160. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

161. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or  modify the item of information upon a lawful reinvestigation.

162. As a result of Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

163. The violations by Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

164. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

165. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o;

Dated: September 18, 2017

**SAGARIA LAW, P.C.**
*/s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

17

Plaintiff hereby demands trial of this matter by jury.


Dated: September 18, 2017                    **SAGARIA LAW, P.C.**
                                                  */s/ Elliot Gale, Esq.*
                                             Scott Sagaria, Esq.
                                             Elliot Gale, Esq.
                                             Attorneys for Plaintiff